IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CHARLES E. SANDY, II,
       Plaintiff,

v.
                                  Civil Action No. 1:08CV120
                                    (Judge Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
       Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and Plaintiff's

alternative Motion for Remand, and has been referred to the undersigned United States Magistrate

Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §

636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I.  Procedural History

Charles E. Sandy, II ("Plaintiff") filed applications for DIB and SSI in August 2006, alleging

disability beginning September 1, 2005, due to a herniated disc in his lumbar spine (R. 122, 128,

159).[1]  The applications were denied at the initial and reconsideration levels (R. 74, 87).  Plaintiff

requested a hearing, which Administrative Law Judge ("ALJ") George A. Mills, III held on January

23, 2008 (R. 25).  Plaintiff, represented by Twila Robinson, a non-attorney, doing business as

---

[1]Plaintiff did return to work after his alleged onset date, briefly working two part-time
jobs simultaneously; however, the ALJ found that this work activity did not represent substantial
gainful activity (R. 14).

Twila's Representation Services, testified on his own behalf. James Ganoe, a Vocational Expert ("VE"), also testified. On January 25, 2008, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, from March 1, 2005, through the date of the decision (R. 21). Plaintiff requested review of the ALJ's decision by the Appeals Council. Plaintiff did not submit any additional evidence to the Appeals Council. The Appeals Council denied Plaintiff's request for review on April 11, 2008 (R. 6), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Charles E. Sandy, II ("Plaintiff") was born October 5, 1971, and was 33 years old on his alleged disability onset date, and 36 on the date of the ALJ's Decision (R. 20, 21). He finished high school and has past relevant work as a furniture delivery person and carpet installer (R. 20). He was injured on the job in August 2004 when he sustained a herniated disk with related severe back pain while carrying large rolls of carpet up steps (R. 204).

An August 23, 2004, MRI showed a central disc herniation suspected at L4-5 with moderate impress on the thecal sac, as well as a suspected extruded disc fragment possibly encroaching on the exiting nerve root. There was also mild to moderate degenerative changes at the L3-4 and L5-S1 levels, without significant encroachment or stenosis, and slight encroachment on the L5 nerve root (R. 275).

On August 24, 2004, neurosurgeon Dr. Richard Douglas examined Plaintiff (R. 205.) He did not recommend surgery at that time. Instead he recommended physical therapy and pain management.

In January 2005, Plaintiff presented to Dr. Mona D. Justo at United Hospital Pain

Management. She diagnosed lumbar radiculopathy, herniated lumbar disc, and myofascial pain (R. 214). Plaintiff received epidural steroid injections from Dr. Justo.

On March 16, 2005, Plaintiff followed up with Pain Management, after receiving two lumbar epidural steroid injections. He reported the injections "helped a lot" and took a lot of the pressure off his lower back (R. 223). On May 25, 2005, plaintiff reported a 40% improvement in his pain after the injections and nerve root block (R. 220). On June 29, 2005, Plaintiff received a right selective nerve root block (R. 216).

Plaintiff also underwent physical therapy, beginning treatment in September 2004, through discharge in March 2005 (R. 208). In the discharge summary, the physical therapist reported that plaintiff had undergone 73 treatments. On discharge he had normal flexibility of the low back without pain and was also able to lift well without pain. He did not want to return to laying carpet, however, because of the heavy lifting involved. The physical therapist therefore recommended that Plaintiff should try to find another job, such as a truck driver or another type of job that would not require heavy lifting.

Plaintiff's alleged onset date is September 1, 2005.

On September 27, 2005, Plaintiff began working 20-25 hours per week as an auto parts salesperson (R. 115). Sometime in 2006, while still working at the auto parts store, Plaintiff worked as a night stocker at Wal-Mart (R. 144).

The ALJ found these jobs did not constitute substantial gainful activity, however.

On July 8, 2006, Plaintiff presented to Dr. James Malone, his family physician, reporting increased lower back pain for the past week. He had been in bed for two or three days. He had gone to the emergency room and received Toradol shots, which helped "just a little bit." The pain was

going down his right leg. Upon examination, Dr. Malone found an equivocal right leg raise at approximately 35 degrees. He gave Plaintiff an injection of Depo-Medrol and ordered a repeat MRI and another appointment with neurologist Dr. Douglas. He also refilled Plaintiff's prescription for Lorcet Plus.

Plaintiff filed his applications for DIB and SSI in August 2006. At this point, Plaintiff had quit working at Wal-Mart, but continued working at the auto parts store while pursuing his Social Security claim.

Dr. Malone's order for a repeat MRI and appointment with Dr. Douglas was delayed pending approval by the workers' compensation claims administrator.

In August 2006, Plaintiff was still working at the auto parts store about 24 hours a week, but was no longer working at Wal-Mart. "If he overdoes it and is exertional in regards to activity, he will notice more pain. He does feel like his right foot and toes are occasionally asleep but not numb. They are not weak." (R. 291).

An August 27, 2006, MRI showed a central to right paracentral disc herniation at the L4-5 level producing narrowing at the canal diameter to a moderate degree. There was a mild narrowing of the right inferior neural foramen and also the left neural foramen due to generalized bulge. At L5-S1 there was mild posterior osteophyte formation with disc bulging producing mild left greater than right neuroforaminal narrowing with no significant central stenosis. The predominant finding was a disc herniation which was fairly large at the L4-5 level. The disc herniation was larger than was previously indicated.

On September 27 and October 12, 2006, Dr. Malone noted there still had been no action by workers' compensation on his request for an evaluation by Dr. Douglas.

On November 4, 2006, Plaintiff underwent a lumbar MRI which showed no significant change since the August 27, 2006 MRI. It still indicated a large right paracentral herniation at the L4-5 level, with "significant impression on the thecal sac with impingement on multiple nerve roots" (R. 389).

On November 20, 2006, Dr. Douglas performed a bilateral L4-5 microlumbar discectomy with bilateral L5 foraminotomies emergently. The postoperative diagnosis was a massive central and slightly to the right herniated disc at L4-5 with bilateral L5 radiculopathies, right greater than left (R. 397).

On November 27, 2006, Dr. Samuel Mossallati reported that he had treated Plaintiff for deep venous thrombosis ("DVT") the previous weekend while Plaintiff was still hospitalized for back surgery (R. 404). Dr. Mossallati described Plaintiff's condition as mild deep venous thrombosis.

Dr. Mossallati subsequently left the practice Plaintiff was visiting for treatment, and Plaintiff then received treatment for his DVT from Dr. John Adeniyi. He was started on Lovenox and Coumadin. He reported minimal pain in his left leg.

On February 6, 2007, Dr. Adeniyi examined Plaintiff, finding extension of the left lower extremity DVT with involvement of the superficial femoral vein but no involvement of the common femoral vein. He also found subtherapeutic anticoagulant therapy. He planned to admit Plaintiff to the hospital for IV heparin therapy and adequate anticoagulation (R. 403). He indicated at that time that he did not believe Plaintiff would need a filter, but a later note dated March 20, 2007, indicated that a vena cava filter was placed (R. 401).

On March 2, 2007, Plaintiff's treating physician, Dr. James Malone, noted Plaintiff's back was doing well post surgery (R. 350). He had gone through the surgery quite well but did develop

a DVT in his left lower leg, and had been going through anticoagulation therapy since then.

On April 17, 2007, Plaintiff presented to Dr. Malone for complaints of worsening back pain over the past few weeks (R. 348). The doctor noted Plaintiff had been out of pain medication "for quite some time." Dr. Malone wanted Plaintiff to return to Dr. Douglas regarding his worsening back pain. He placed him back on Lortab. There was no mention of the DVT.

Plaintiff presented to Dr. Malone on May 18, 2007 for follow up of his back pain (R. 346). Plaintiff said his back "does actually seem better at this point in time." He was still seeing Dr. Adeniyi for his "history of DVT's." He still had 2+ edema in the left leg below the knee "which is not uncommon and normal for him."

Plaintiff underwent another MRI of the lumbar spine on May 26, 2007 (R. 387). The MRI showed no evidence of recurrent disc herniation or spinal stenosis, but did show soft tissue density ventral to the thecal sac consistent with scar tissue. In addition, there were posterior osteophytes and facet arthrosis; moderate bilateral neuroforaminal encroachment; and a diffused disc bulge at L5-S1 with facet arthrosis, resulting in moderate bilateral foraminal encroachment and a small to moderate central disc herniation at L3-4 with extrusion inferiorly. A hand-written note on the MRI report indicated that Plaintiff needed another evaluation by Dr. Douglas.

On June 14, 2007, Plaintiff followed up with Dr. Malone (R. 344). Plaintiff said his back pain was about the same, "may be just a little bit better today." He was to see Dr. Adeniyi the next week. Dr. Malone found Plaintiff's back "clinically stable," and noted he used his Lortab "very sparingly."

On July 20, 2007, Plaintiff presented to Dr. Malone for complaints of bright red rectal bleeding on and off for the past day and a half (R. 342). He had a history of hemorrhoids. Dr.

Malone scheduled him for a colonoscopy.

On August 16, 2007, Plaintiff followed up with Dr. Malone regarding his back pain (R. 340). Plaintiff stated it was "still about the same. There are days when it is worse and days when it is better. Any activity seems to worsen it and also if he sits. He can only sit for about a half an hour to an hour at a time as sitting any longer worsens it." Dr. Malone assessed chronic lumbosacral pain, and found "clinically, he is stable." He noted that Plaintiff used his hydrocodone "sparingly."

On November 15, 2007, Plaintiff presented to Dr. Malone for follow up of his back pain and workers' compensation case (R. 338). Plaintiff told Dr. Malone that Dr. Adeniyi, his vascular surgeon, did not want to see him back for a year. Upon examination, Plaintiff's back had no tenderness. Dr. Malone assessed chronic lumbosacral back pain, clinically stable, and noted that Plaintiff used his Lortab "very sparingly."

On July 26, 2007, Plaintiff filed a Request for Hearing by Administrative Law Judge (R. 94). One month later, the ALJ responded to the request, stating he would mail a Notice of Hearing at least 20 days before the date of the hearing "to tell you its time and place" (R. 96). On October 31, 2007, Plaintiff's representative, Ms. Robinson, submitted to the Office of Disability and Review a "Financial Hardship/Dire Need" form, stating that Plaintiff wished to request his claim be expedited due to financial hardship/dire need. On November 5, 2007, the administration did grant a "critical expedite" of Plaintiff's case (R. 103). On December 20, 2007, the ALJ sent a Notice of Hearing to Plaintiff with copy to Ms. Robinson, stating that the hearing was scheduled for January 23, 2008, and stating:

**You May Submit Additional Evidence and Review Your File**

> If there is more evidence you want to submit, get it to me right away. If you cannot get the evidence to me before the hearing, bring it to the hearing. If you want to see

your file before the date of the hearing, call this office.

(R. 106).

On January 8, 2008, Ms. Robinson sent a letter to the ALJ enclosing records from Dr. Malone, dating from 1994 through November 15, 2007.[2]

ALJ Mills held the administrative hearing on January 23, 2008, more than a month after the Notice of Hearing was sent. Plaintiff was represented by Twila Robinson, a non-attorney doing business as Twila's Representation Service (R. 84). Documents submitted to Social Security indicate that Plaintiff had appointed Ms. Robinson as his representative in October 2006, agreeing that if there was a favorable decision, he would pay her a fee equal to 25% of his past due benefits, or, if less, the maximum fee specified in the Social Security Act (R. 85). Ms. Robinson's letterhead states:

## Twila's Representation Service
### SSDI & SSI Benefits

During the hearing, the ALJ asked Ms. Robinson if she had any opening comments or arguments, to which she replied: "Your Honor, due to my hospitalization, I really didn't get a prehearing memorandum out to you" (R. 31). She then stated:

> Also, he has had - - the last MRI that was performed was May 26 of 2007, which was after his surgery in 2006 . . . . So he did, in fact, have another surgery by - - performed by Richard Douglas on November 20, 2006. Then his last MRI was performed on May 26, 2007, which is all contained within the record. With that being said, I have no other comments.

(R. 31).

Subsequently, the following colloquy took place between Plaintiff and the ALJ:

---

[2]The undersigned has included in the facts the records from March 2, 2007, until November 15, 2007.

Q. Okay. From the record, it appears, then, that you've had a Workers' Compensation settlement. Is that right?

A. Yeah. They gave me a - -

Q. So, you, you were receiving Workers' comp temporarily every two weeks?

A. Yeah, whenever - -

Q. For how long?

A. Over the - - ever since '04, you know, in between times that they'd cut me off, and I'd have to appeal it or whatever.

Q. And then - - and you've settled now permanently for a percentage?

A. They, they told me this last one was - - yeah that-- that was it.

Q. How much did you receive?

A. $12, 216.

Q. And when was that received?

A. They're paying me payments on it. The first payment was - - I received it in November. It was for - - it was a December payment.

(R. 37)

A later exchange took place as follows, also between the ALJ and Plaintiff:

Q. My review of the records basically indicates that - - and until Ms. Robinson brought in those medical records, I saw where you were just dealing with a herniated disc at L4-5, you had injections, you're on pain medication, your permanent rating for Workers' comp was eight percent for your back. Is that about right?

A. I think that's what they said.

Q. All right. And then, you know, there was no, no surgery being performed; and then, all of a sudden, in November of '06, which I just received today, you had a microdiscectomy at the L4-5.

A. Yes, sir

9

(R. 46-47).

. . . .

Q.      What about your back?  Are you taking pain medication for your back?

A.      I take Hydrocodone for pain.

Q.      You're still on Hydrocodone for pain?

A.      Yes, sir.

Q.      Does your surgeon know that?

A.      Yes, sir.

Q.      How long have - - it's been over six months - -

A.      And - -

Q.      - - since you had your surgery.

A.      I take - - and I also take Tizanidine for muscle spasms.

Q.      Who prescribes it?

A.      Dr. Malone.

Q.      And he's your treating physician?

A.      Yes, sir.  I was on - -

Q.      See, I don't have, I don't have very many records after the surgery.  I mean, that seems to kind of - - except Dr. Malone indicating that all of a sudden, you had a rectal bleed, and had a hemorrhoid problem, and had to have a colonoscopy, and had some hemorrhoids taken out.

A.      No, I had no hemorrhoids taken out.

Q.      It wasn't from hemorrhoids?

A.      Huh–huh.

Q.      What was the bleeding from?

A.      They don't know.

Q.      Okay.

A.      They said that they didn't see nothing in there.

Q.      And the doctor reported that, that you're clinically stable from your back surgery.  You don't have any other problems.  I don't understand the Hydrocodone.  You're not in pain management.  Are you saying that your back surgery failed?

A.      I'm walking, but I'm in constant pain every day.

Q.      Do you use a cane, crutch, wheelchair?

A.      Some days, I'll use a cane, depending on how I feel.

Q.      Who prescribed the cane?

A.       I already had one.  My dad gave it to me.

Q.      So, you're using it yourself?

A.      Right.

Q.      Do you have a TENS unit?

A.      A what?

Q.      TENS unit.  Do you know what that is?

A.      No, sir, I don't.

Q.      Okay.  And you don't use a brace or anything on your back now?

A.      No, I can't use a brace.

Q.      And do you need any more surgeries?

A.      I hope not, but, you know, you never know.

Q.      Have you been scheduled?

A.      No, no scheduled back surgeries.

Q.      Where's your pain?

A.       It's in my lower back, and it shoots pains down my legs.

Q.       Okay. And Dr. Douglas is aware of that?

A.       Yes, sir.

Q.       And what's he doing for that?

A.       Well, back when - - in 2007, when I had the MRI, he sent me for a spinal injection to help with the pain at that time.

Q.       Um-hum.

A.       And since then, I've just been taking my normal pain medications.

Q.       Does it control your pain?

A.       It helps.

Q.       On a scale from zero to 10, 10 being the worst possible pain, how would your rate your pain from your back now, after surgery?

A.       It depends on the day, you know. Today, it's probably about a three or a four; but some days, it'll get up there close to nine or 10. It just depends on the weather, and . . . .

(R. 47-50).

At the conclusion of the questioning of Plaintiff by the ALJ, the ALJ asked Ms. Robinson if she had any questions she'd like to pursue before the VE was called (R. 60). She replied: "Actually, Your Honor, you've done a fine job, as always." (R. 61). Then, addressing the Plaintiff, Ms. Robinson said: "There's nothing else I have to ask you. As you can see, he was pretty thorough with the questioning. But is there anything else you thing we might have missed that you need to speak on?" Plaintiff responded:

A.       Well, you know, other than, you know, like the blood clot or whatever, that causes my leg to swell up. You know, that's another reason why, you know, being on my feet and walking or whatever is limited you know. I wear a compression stocking every day to help with swelling, because if I don't it swells up and starts- - at that point, it starts oozing out.

Q.    How often do you see Dr. Adini [sic] for that?

A.    Well, I don't have to go back to him now for a year, and he's treated me for about a year now, and says at the 10 to 12 milligrams, he feels that's safe enough to let me go for about a year.

(R. 61).  Following the questions regarding the DVT, the ALJ asked Ms. Robinson if she had anything else, to which she responded, "I have no further."

The ALJ then called on the VE to testify whether there would be any work available for a hypothetical individual with Defendant's background, with the limitations found by the State agency reviewing physician, as follows: Lift 20 pounds occasionally, 10 pounds frequently; Stand and walk at least six hours in an eight-hour workday; Sit six hours in an eight-hour workday; Never climb ladders, ropes or scaffolds and only occasionally climb ramps/stairs; Only occasionally balance, stoop, kneel, crouch, and crawl; and Avoid concentrated exposure to cold, vibration, and hazards and unprotected heights (R. 63).

The VE responded that there would be a significant number of jobs in the national economy available to such a hypothetical individual.  The ALJ then asked if there would still be a significant number of jobs available if the individual needed a sit/stand option, to which the VE replied that there would. (R. 65).

The ALJ then asked the VE whether any jobs would exist in significant numbers for the same hypothetical individual if the exertional level were reduced to sedentary, to which the VE replied that there would still be a significant number of jobs available (R. 66).

Finally, the ALJ asked if there would be any jobs available for an individual with the pain and limitations Plaintiff alleged– in other words, if Plaintiff's testimony was "completely credible." The VE replied that there would be no jobs available with those limitations (R. 67).

Following the ALJ's questioning of the VE, he asked Ms. Robinson "All right, Ms. Robinson, do you have any questions?" to which she responded:

Q.  The only question I have is, what would be the septal rate – acceptable rate of absenteeism for an individual when it comes to the employer? What's the most they could miss?

A.  Usually, an employer will allow an individual to miss one to two days per month. Anything more than that, and you're in jeopardy of losing your employment.

Q.  Okay. Your Honor, I have no further questions.

ALJ:  All right. Do you consider the record now complete and ready for decision?

Rep:  Yes, Your Honor.

ALJ:  Mr. Sandy, I'm required to issue a written decision. I'll send it to you at the address that I have for you . . . .

Pl:  Yes, sir.

ALJ:  A copy will be sent to your counsel, Ms. Robinson. If you have any questions about the decision after you receive it, be sure and contact her. I know, with her experience in these type of cases, she'll be able to answer your questions.

Pl:  Thank you.

ALJ:  Counsel's indicated the record's complete. I'll consider that to be the case. This hearing is ended.

(R. 67-69).

## Evidence Submitted to the Court

On January 25, 2008, the ALJ issued his Decision. The ALJ on that same date sent a Notice of Decision to Plaintiff, with a copy to Ms. Robinson, directing that he "should submit any new evidence you wish to the Appeals Council to consider with your request for review." (R. 9). On February 8, 2008, Ms. Robinson sent a Request for Review of Hearing Decision/Order Form (HA-520-U5) to the Appeals Council with a cover letter. No new evidence was submitted to the Appeals

Council. On April 11, 2008, the Appeals Council denied Plaintiff's request for review.

The following evidence was not submitted to the ALJ or to the Appeals Council, but has been submitted to the Court:

On November 15, 2006, Plaintiff presented to neurologist Dr. Douglas, with "continued complaints of increasing low back pain." Dr. Douglas recommended microlumbar discectomy surgery on that date, scheduled for November 20, 2006.

On November 27, 2006, one week past surgery, Plaintiff presented to Dr. Douglas with "some continued back pain which is improving daily." He had no complaints of leg pain. He was found to be "doing well status post microlumbar discectomy . . . ."

On December 13, 2006, about three weeks after surgery, Plaintiff continued to improve and was found by Dr. Douglas to be "doing well." He was to begin physical therapy and return following that for further evaluation and recommendations.

Plaintiff next saw Dr. Douglas on June 8, 2007, with continuing complaints of low back pain and occasional bilateral leg pain, but his worst complaint was his low back. Dr. Douglas noted the MRI (already in evidence), revealed postoperative changes at L4-5 "with no evidence of recurrent disc herniation. He does have some epidural fibrosis." Dr. Douglas explained to Plaintiff that "most of these complaints do decrease." He opined that Plaintiff had no evidence of recurrent disc herniation. He concluded that if Plaintiff continued to have complaints of pain, it may be possible to coordinate a left L5 nerve root block.

On October 2, 2007, Plaintiff presented for an Independent Medical Evaluation for workers' compensation, performed by Charles Lefebure, M.D. Plaintiff told Dr. Lefebure he had persistent back pain which limited most of his daily routines. Bending over to put on shoes and socks was

difficult.  Otherwise he could do his own bathing and dressing and clothing.  He did light household work and could drive a vehicle for mild periods of time.  He was "not doing much lifting as this is rather uncomfortable," and he was no longer doing woodworking or hunting as he had prior to his injury.  He described difficulty with sleep, oftentimes having to change positions to get some relief.  Lying on the left side was most comfortable.  He could walk moderate distances, although standing in one spot was somewhat difficult and he had to change positions with that activity.

Upon physical examination, Plaintiff walked slowly with fairly short strides but without external support.  His pelvis was level and his spine was straight.  He had multiple areas of tenderness: right and left paralumbar tissues, the lower vertebral spine, and SI joint.  However, he had reasonably good motion of his shoulders and scapula without acute pain, and there was no muscle spasm noted.  His motions of the lumbosacral spine were mildly to moderately limited, "complaining primarily of lower back pain."  He showed evident edema of the left calf and ankle, but was non tender throughout the left calf and foot and moved them rather actively.

Neurologically, Plaintiff had symmetrical active reflexes of both knees and ankles; but a slight decrease of sensation of the left ankle and foot.  He had no muscular weakness in the hips, knees or feet.  Straight leg raising sitting caused mild to minimal back discomfort, but straight leg raising supine caused a fair amount of left lower back pain when the left leg was elevated to 50 degrees and some right back pain when the right leg was elevated to 60 degrees.  Motion of the hips was not restricted or painful.  Dr. Lefebure completed a low back examination form, stating that Plaintiff's flexion of his back was limited to 36 degrees.  He concluded:

> The patient appears to be in a fairly stable state of medical condition, although still possibly under the care of the pain clinic provide he could possibly benefit from further treatment measures there at their discretion.  I don't know of specific measures that might be helpful to him other than perhaps repeat epidural steroid

injections for his back pain, but I feel that it is most likely for pain control. He also required chronic management of chronic left leg venous stasis for which he does use compression hose for control of edema. He is on medications primarily for back pain.

Dr. Lefebure found Plaintiff had a total 16% whole person impairment for both his spine and vascular impairments.

The doctor's lumbar flexion range of motion of 36 is of most significance to this claim, because Plaintiff claims it is inconsistent with the ALJ's determination that he could occasionally stoop.

Finally, on September 17, 2008, Plaintiff presented to Dr. Douglas, more than a year after his last documented visit to Dr. Douglas, and eight months after the ALJ's decision.[3] He complained of continued low back pain into his left gluteal, left lateral thigh and occasionally into the anterior shin. His biggest relief was lying down on his left side. The neurologist reviewed an MRI of the lumbar spine from August 14, 2008, seven months post decision, which revealed a disc protrusion at L3-4, but no evidence of recurrent disc herniation. In fact, Dr. Douglas opined there was "[n]o significant change from 2007 in his MRI." Dr. Douglas then stated:

> I do not feel he will ever return to any type of gainful employment. He has low back pain which required surgery and has had significant vascular insufficiency causing significant swelling of his left lower extremity. He has been required to be on Coumadin and even on the Coumadin he had a pulmonary embolus requiring a Greenfield filter placement. I do not recommend any surgical intervention at this given juncture. If his pain intensifies, we could contemplate a possible referral to pain management, but at this time I would wholeheartedly support his disability and I do not feel he will return to any type of gainful employment secondary to his back pain and significant vascular insufficiency.

### III. Administrative Law Judge Decision

---

[3]The Court also notes this date is two months after the Complaint was filed in this case, and a month after Defendant filed his Answer.

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.  The claimant has not engaged in substantial gainful activity since March 1, 2005, the alleged onset date (20 CFR 1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Low back pain with a herniated nucleus pulposus at L4-5, status post surgery; and a blood clot in his lower extremity, status post corrective surgery (20 CFR §§ 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  Based on all the available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing, and those performed in the seated position often require the worker to operate hand or leg controls (20 CFR 404.1567 and 416.967). In addition, the claimant has the following non-exertional limitations: He can do no more than occasional postural movements, including climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling; but no climbing of ladders, ropes or scaffolds; and he must avoid work around environmental hazards, such as concentrated exposure to cold, vibrations, and no work around unprotected heights, or dangerous moving plant machinery.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on October 5, 1971, and was 33 years old, which is defined as a "younger individual" within the meaning of the regulations, on the alleged disability onset date (20 CFR §§ 404.1563 and 416.963).

8.  The claimant has at least a "high school education" and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 10 CFR Part 404, Subpart P, Appendix 2).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 12-21).

## IV. Contentions

A. Plaintiff contends:

1. This matter must be remanded because the Administrative law judge failed to fully and fairly develop the record in Mr. Sandy's claim;

   or, in the alternative,

2. The Court has the authority pursuant to the sixth sentence of 42 U.S.C. section 405(g) to remand this claim because there is new evidence which is material and there was good cause for the failure to incorporate such evidence into the record.

B. The Commissioner contends:

1. The Agency's regulations specifically state that a Plaintiff's representative has an affirmative duty to act with reasonable promptness to obtain the information and evidence that the claimant wants to submit in support of his or her claim, and to forward the same to the Agency for consideration, including assisting the claimant in bringing to the Agency's attention everything that shows the claimant is disabled, and to assist the claimant in furnishing medical evidence. 20 CFR sections 404.1740(b), 416.1540(b).

2. Remand is not appropriate under the sixth sentence of section 405(g) because the new material submitted is not material and because Plaintiff has not established good cause for his failure to submit it to the Agency at the administrative level of his claim.

## V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. The ALJ's Duty to Develop the Record

Plaintiff first argues that the claim should be remanded because the ALJ failed to fully and fairly develop the record in his claim. As a threshold matter, the undersigned notes that Plaintiff does not argue that the ALJ improperly determined he was not disabled based on the evidence that the ALJ actually had before him. That evidence showed that Defendant underwent a microlumbar discectomy on November 20, 2006. While hospitalized for his back surgery, Plaintiff underwent treatment for deep venous thrombosis his doctor described as "mild." On February 6, 2007, Plaintiff's treating physician found he had extension of his DVT with involvement of the superficial femoral vein but no involvement of the common femoral vein. He also found Plaintiff had subtherapeutic

20

anticoagulant therapy. Plaintiff was admitted to the hospital for IV heparin therapy and adequate anticoagulation therapy. At about the same time, Plaintiff underwent a procedure to have a vena cava filter placed to prevent any blood clots from traveling to the lungs and causing a pulmonary embolism.

Plaintiff underwent an MRI of the lumbar spine on May 26, 2007, which showed soft tissue density ventral to the thecal sac consistent with scar tissue, posterior osteophytes and facet arthrosis, moderate bilateral neuroforaminal encroachment, and a diffused disc bulge at L5-S1 with facet arthrosis, resulting in moderate bilateral foraminal encroachment and a small to moderate central disc herniation at L3-4 with extrusion inferiorly. There was no evidence of recurrent disc herniation or spinal stenosis.

On March 2, 2007, Plaintiff's treating physician, Dr. James Malone, noted Plaintiff's back was doing well post surgery (R. 350). He had gone through the surgery quite well but did develop a DVT in his left lower leg, and had been going through anticoagulation therapy since then.

On April 17, 2007, Plaintiff presented to Dr. Malone for complaints of worsening back pain over the past few weeks (R. 348). The doctor noted Plaintiff had been out of pain medication "for quite some time." Dr. Malone wanted Plaintiff to return to Dr. Douglas regarding his worsening back pain. He placed him back on Lortab. There was no mention of the DVT.

Plaintiff presented to Dr. Malone on May 18, 2007 for follow up of his back pain (R. 346). Plaintiff said his back "does actually seem better at this point in time." He was still seeing Dr. Adeniyi for his "history of DVT's." He still had 2+ edema in the left leg below the knee "which is not uncommon and normal for him."

Plaintiff underwent another MRI of the lumbar spine on May 26, 2007 (R. 387). The MRI

showed no evidence of recurrent disc herniation or spinal stenosis, but did show soft tissue density ventral to the thecal sac consistent with scar tissue. In addition, there were posterior osteophytes and facet arthrosis; moderate bilateral neuroforaminal encroachment; and a diffused disc bulge at L5-S1 with facet arthrosis, resulting in moderate bilateral foraminal encroachment and a small to moderate central disc herniation at L3-4 with extrusion inferiorly. A hand-written note on the MRI report indicated that Plaintiff needed another evaluation by Dr. Douglas.

On June 14, 2007, Plaintiff followed up with Dr. Malone (R. 344). Plaintiff said his back pain was about the same, "may be just a little bit better today." He was to see Dr. Adeniyi the next week. Dr. Malone found Plaintiff's back "clinically stable," and noted he used his Lortab "very sparingly."

On July 20, 2007, Plaintiff presented to Dr. Malone for complaints of bright red rectal bleeding on and off for the past day and a half (R. 342). He had a history of hemorrhoids. Dr. Malone scheduled him for a colonoscopy.

On August 16, 2007, Plaintiff followed up with Dr. Malone regarding his back pain (R. 340). Plaintiff stated it was "still about the same. There are days when it is worse and days when it is better. Any activity seems to worsen it and also if he sits. He can only sit for about a half an hour to an hour at a time as sitting any longer worsens it." Dr. Malone assessed chronic lumbosacral pain, and found "clinically, he is stable." He noted that Plaintiff used his hydrocodone "sparingly."

On November 15, 2007, Plaintiff presented to Dr. Malone for follow up of his back pain and workers' compensation case (R. 338). Plaintiff told Dr. Malone that Dr. Adeniyi, his vascular surgeon, did not want to see him back for a year. Upon examination, Plaintiff's back had no tenderness. Dr. Malone assessed chronic lumbosacral back pain, clinically stable, and noted that Plaintiff used his Lortab "very sparingly."

The undersigned finds that, "[a]ssuming the record to be properly developed, there [is] substantial evidence to sustain the Secretary's finding." <u>Marsh v. Harris</u>, 632 F.2d 296 (4th Cir. 1980). The above-stated evidence substantially supports the ALJ's determination that Plaintiff retained the residual functional capacity to perform the exertional demands of light work, with the following additional limitations: no more than occasional postural movements, including climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling; and with no climbing of ladders, ropes or scaffolds; no environmental hazards; and no work around unprotected heights or dangerous moving plant machinery.

Plaintiff argues, however, that other evidence, not in the record before the ALJ, shows his determination was not supported, and also that the ALJ failed in his duty to fully develop the record. 20 CFR section 404.1512 (a) provides:

> In general, you have to prove to us that you are blind or disabled. Therefore, you must bring to our attention everything that shows that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and, if material to the determination of whether you are blind or disabled, its effect on your ability to work on a sustained basis. We will consider only impairment(s) that you say you have or about which we receive evidence . . . .

Section (c) provides:

> You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your claim . . . .

Section (d), however, provides:

> Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months

before your filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

Despite the Regulation cited above, courts have generally found the ALJ generally has a duty to fully and fairly develop the record. In <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit restated the ALJ's duty as follows:

> This circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate. *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir.1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir.1980).

Although <u>Cook</u> did not itself distinguish between types of claimants or whether they were represented, the two cases cited by the Fourth Circuit in <u>Cook</u> are easily distinguishable from Plaintiff's case. <u>Walker</u> is distinguishable from Plaintiff's case in that Walker had only four years of formal education and appeared unrepresented before the administrative law judge for a hearing that lasted only 19 minutes in which the claimant called no witnesses, but testified via a "barely-coherent, rambling monologue by her concerning, among other things, cats, chickens, unnatural sexual acts sought to be performed on her nephew, the death of her sister, and the removal of her nephew from her home." The Fourth Circuit found the ALJ made no effort to focus her testimony on relevant matters, "simply wait[ing] for Walker to exhaust herself and then conclud[ing], "Do you think that about covers your problems?" The court had "no difficulty concluding that the administrative law judge failed in her duty 'scrupulously and conscientiously (to) probe into, inquire of, and explore for all the relevant facts' in this case involving an unrepresented, poorly-education pro se claimant." <u>Id.</u> at 714.

In <u>Marsh</u>, the claimant again was not represented and "was completely unschooled on the

24

requirements for proving his case." Among others, the Fourth Circuit found:

> His testimony provided sketchy evidence concerning nocturnal episodes resulting from his epileptic condition, he was completely unaware of any necessity for a recent EEG, and he furnished incomplete information about his ability to perform household chores, the number and frequency of the attacks, and the effects of his medication.

Significantly, the ALJ in Marsh had promised the claimant he would obtain further evidence from his treating physician, which he then failed to do. The ALJ noted in his decision he had tried unsuccessfully to contact the physician. The Fourth Circuit stated:

> [The ALJ] nevertheless deemed it appropriate to close the record without this evidence because he had been unable to talk with Dr. May during a two-month period. Not only did Marsh rely on the ALJ to obtain this testimony, but if obtained is might well have contributed to a proper ALJ decision.

Id. at 299. The court concluded:

> Where the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded.

Id. at 300.

The undersigned notes that Cook's holding is that the ALJ has a duty, whether or not the claimant is represented, to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate. That duty is heightened where the claimant is not represented, however.

The undersigned finds no heightened duty in this case, although Plaintiff points out several times that his representative was not a lawyer. Plaintiff was represented by Twila Robinson, a non-attorney doing business as Twila's Representation Service (R. 84). Documents submitted to Social Security indicate that Plaintiff had appointed Ms. Robinson as his representative in October 2006, agreeing that if there was a favorable decision, he would pay her a fee equal to 25% of his past due

benefits, or, if less, the maximum fee specified in the Social Security Act (R. 85). Ms. Robinson's

letterhead states:

**Twila's Representation Service**
**SSDI & SSI Benefits**

Pursuant to 20 CFR 404.1700 *et seq.*, a claimant may appoint someone to represent him in his

dealings with the administration. 404.1703 provides:

> Representative means an attorney who meets all of the requirements of section 404.17059(a), or a person other than an attorney who meets all of the requirements of section 404.1705(b) and whom you appoint to represent you in dealings with us.

404.1705(b) expressly states:

> You may appoint any person who is not an attorney to be your representative in dealings with us if he or she–
> (1) Is generally known to have a good character and reputation;
> (2) Is capable of giving valuable help to you in connection with your claim;
> (3) Is not disqualified or suspended from acting as a representative in dealing with us; and
> (4) Is not prohibited by any law from acting as a representative.

404.1707 provides:

> We will recognize a person as your representative if the following things are done:
>
> (a) You sign a written notice stating that you appointed the person to be your representative in dealing with us;
> (b) That person signs the notice agreeing to be your representative if the person is not an attorney. An attorney does not have to sign a notice of appointment.
> (c) The notice is filed at one of our offices if you have initially filed a claim or have requested reconsideration . . . .

404.1740(b) provides the representative's affirmative duties:

> A representative shall, in conformity with the regulations setting forth our existing duties and responsibilities and those of claimants (see section 404.1512 in disability and blindness claims):

(1) Act with reasonable promptness to obtain the information and evidence that the claimant wants to submit in support of his or her claims, and forward the same to us for consideration as soon as practicable. In disability and blindness claims, this includes the obligations to assist the claimant in bringing to our attention everything that shows that the claimant is disabled or blind, and to assist the claimant in furnishing medical evidence that the claimant intends to personally provide and other evidence that we can use to reach conclusions about the claimant's medical impairment(s) and, if material to the determination of whether the claimant is blind or disabled, its effect upon the claimant's ability to work on a sustained basis, pursuant to 404.1512(a);

....

(3) Conduct his or her dealings in a manner that furthers the efficient, fair and orderly conduct of the administrative decisionmaking process, including duties to:

(I) Provide competent representation to a claimant. Competent representation requires the knowledge, skill, thoroughness and preparation reasonably necessary for the representation. This includes knowing the significant issue(s) in a claim and having a working knowledge of the applicable provisions of the Social Security Act, as amended, the regulations and the Rulings . . . .

In the present case, Plaintiff appointed Ms. Robinson as his representative in October 2006, approximately two months after filing his initial application for benefits, and approximately one month after his application was denied at the initial level. Ms. Robinson accepted the appointment. Both signed a form stating that if Plaintiff's claim was decided favorably he would pay Ms. Robinson, his representative, a fee equal to 25% of any past due benefits resulting from his claim, or, if less, the maximum fee specific in the social Security Act. The required notice was submitted to the Commissioner.

Based on all of the above, the undersigned finds that Plaintiff was represented by a professional non-attorney benefits representative. With the exception of the necessity for a non-attorney representative to sign the appointment form, and that a non-attorney representative's fee cannot be held back, there appears no differentiation between an attorney-representative and a non-

attorney representative in the allowance of or ability to handle a claimant's case at the administrative level. Each one's duties and obligations are the same. It is also clear from the record and the transcript of the hearing that Ms. Robinson was experienced in these matters.

Immediately following her appointment, Ms. Robinson signed, as Plaintiff's representative, his Request for Reconsideration. The administration denied Plaintiff's claim at the reconsideration level, noting it had considered, "in addition to the medical evidence already in file, evidence from the following sources: James E. Malone DO report received 11/09/2006, United Hospital Center report received 12/13/2006, and Brickstreet Insurance report received 11/17/2006 (R. 87).

Plaintiff filed his Request for Hearing in July 2007, with Ms. Robinson signing as his representative. One month later, the administration sent a letter explaining the hearing, explaining how to see the evidence in the file, and about providing additional evidence, as follows:

> If there is more evidence you want the ALJ to see, get it to us as soon as possible. If you need help, you should contact us immediately. Evidence you cannot get to us before the hearing may be brought to the hearing. You may ask the ALJ to issue a subpoena that requires a person to submit documents or testify at your hearing.

On October 31, 2007, Ms. Robinson sent, under her own letterhead, a letter attaching a "Financial Hardship/Dire Need Form" and a "Utility Shut-off Notice," and requesting that those records be made part of the file.

On December 20, 2007, the ALJ sent a Notice of Hearing, stating that the hearing was scheduled for January 23, 2008, and again advising that, "if there is more evidence you want to submit, get it to me right away. If you cannot get the evidence to me before the hearing, bring it to the hearing. If you want to see your file before the date of the hearing, call this office."

Ms. Robinson submitted new evidence on January 8, 2008, two weeks before the hearing,

including records from Plaintiff's treating physician Dr. Malone, up to and including an office visit on November 15, 2007.

Ms. Robinson submitted other evidence, including records from Dr. Douglas and Dr. Adeniyi, at the hearing on January 23, 2008.

At the start of the hearing, the ALJ stated, as regards the evidence in the record:

ALJ:    Now with respect to the file itself, Counsel, I'm showing Exhibits - - in the A section, I'm showing four; in the B section, there are 12; in the D section, there are seven; in the E section, there are 10; and up to the present date, I have 13 in the F section. You filed Dr. Douglas' records, and I can't remember the other doctor's name

REP:    Adini - -

ALJ:    - - Adini.

REP:    - - Your Honor.

ALJ:    Dr. Adini at 14 and 15F. Have you had an adequate opportunity to review the CD prior to the hearing?

REP:    Yes, Your Honor, I have.

ALJ:    Do you have any objections to including those Exhibits?

REP:    No, Your Honor.

Subsequently, Ms. Robinson affirmatively stated that "the last MRI that was performed was May 26, of 2007, which was after his surgery in 2006." [and again] "Then, his last MRI was performed on May 26, 2007, which is all contained within the record."

Later in the hearing, the ALJ asked Plaintiff if Dr. Douglas was aware of his continued back pain and Plaintiff said yes. The ALJ asked what Dr. Douglas was "doing for that," to which Plaintiff

testified: "Well, back when - - in 2007, when I had the MRI, he sent me for a spinal injection to help with the pain at that time . . . . And since then, I've just been taking my normal pain medications." The ALJ then asked Plaintiff if his "regular pain medications" controlled his pain, and Plaintiff responded, "It helps," testifying that the amount of pain depended on the day. He stated that on the day of the hearing, his pain was probably a three or four, "but some days it'll get up there close to nine or 10. . . ." Defendant said he sometimes used a cane, but it was his own cane, not prescribed for him, and he had not had a TENS unit or a brace. He was not scheduled for any more surgeries.

At the conclusion of the hearing, the ALJ stated: "Counsel's indicated the record's complete. I'll consider that to be the case" (R. 69). There was no response or objection from Plaintiff or his representative.

The ALJ issued his decision on January 25, 2008. The Notice of Decision notified Plaintiff that he "should submit any new evidence you wish to the Appeals Council to consider with your Request for Review" (R. 9).

Plaintiff filed his Request for Review of Hearing Decision on February 11, 2008. He did not submit any new evidence to the Appeals Council.

Plaintiff argues that "[a]lthough the ALJ expressed doubt that Dr. Douglas was aware of Mr. Sandy's back and leg pain after the surgery, he made no effort to obtain Dr. Douglas' records." (Plaintiff's brief at 10). Yet the ALJ expressly stated at the outset of the hearing: "You filed Dr. Douglas' records" that day. Plaintiff's representative affirmatively stated that the ALJ had all the records. When the ALJ asked Plaintiff what Dr. Douglas was doing for his continued back pain, Plaintiff testified that "back when - - in [May] 2007, when I had the MRI, he sent me for a spinal injection to help with the pain at that time . . . . And since then, I've just been taking my normal pain

medications" (R. 50). Significantly, Plaintiff's representative did, on January 8, 2008, submit records to the ALJ, including records from Plaintiff's treating physician, Dr. Malone, the last of which was dated November 15, 2007 (R. 336). On that date, Dr. Malone noted Plaintiff had chronic lumbosacral back pain, but that he was clinically stable and used his Lortab "very sparingly" (R. 338).

From all of the above, the undersigned cannot say that the ALJ should have been aware there were more records from Dr. Douglas, with the possible exception of one sometime around May 2007. Plaintiff explained at the hearing, however, that at that visit Dr. Douglas gave him an injection, and since then he was just taking his usual medications. From that testimony, Ms. Robinson's express statements that the ALJ had all the evidence, and Dr. Malone's records dating up to November 2007, the undersigned finds the ALJ did not commit reversible error by failing to perform his duty to fully develop the record in regard to Dr. Douglas' records.

Plaintiff also argues that the ALJ failed to obtain Dr. Lefebure's report, prepared at the request of the Workers' Compensation claims administration, "although it was alluded to in an award letter that was in the record," and that that failure also was a breach of his duty to fully develop the evidence. The undersigned cannot say the ALJ committed reversible error by failing to discover records to which another record "alluded." There was an award letter in the record, stating that Dr. Lefebure's exam indicated Plaintiff had an 8% permanent partial disability, and finding Plaintiff classified under the Lumbar, Category III of Table 85-20-C." On that basis, Workers' Compensation awarded Plaintiff a total of $12,216.00, which closed his claim.

Although, as Plaintiff argues, this award letter "alluded to" Dr. Lefebure's report, it otherwise does not really indicate anything significant. It simply stated that Plaintiff had an IME, based upon which he was classified under Lumbar Category III. Lumbar Category III requires only:

Significant signs of radiculopathy, such as dermatomal pain and/or in a dermatomal distribution, sensory loss, loss of relevant reflex(es), loss of muscle strength or measured unilateral atrophy above or below the knee compared to measurements on the contralateral side at the same location; impairment may be verified by electrodiagnostic findings

**or**

history of a herniated disk at the level and on the side that would be expected from objective clinical findings, associated with radiculopathy, or individuals who had surgery for radiculopathy but are now asymptomatic

**or**

fractures: (1) 25% to 50% compression of one vertebral body; (2) posterior element fracture with displacement disrupting the spinal canal; in both cases, the fracture has healed without alteration of structural integrity

WV Code Title 85-20-C (emphasis added). Based upon this definition, the ALJ could hardly have been surprised that Plaintiff was classified under Lumbar Category III. Under these circumstances, the undersigned finds the failure to request Dr. Lefebure's actual records does not equal failure of the ALJ to perform his duty of fully developing the record. Again, he was expressly informed that he had all of the evidence. Ms. Robinson did submit, on January 8, 2007, records from Dr. Malone that covered up to November 2007. Dr. Lefebure's examination was performed October 2, 2007, yet neither Plaintiff nor his representative ever mentioned it. A record from Dr. Malone dated only three days later does not mention it. From all of the above the undersigned finds it was reasonable for the ALJ to believe he had all the records "necessary for adequate development of the record." Walker v. Harris, 642 F.2d 712, 714 (4th Cir.1981); Marsh v. Harris, 632 F.2d 296, 300 (4th Cir.1980).

The undersigned therefore finds the ALJ did not commit reversible error by failing to fully develop the record, especially where the ALJ was assured he had all the records; records from another physician up through November 2007 were submitted; more records were submitted at the hearing, including records from Dr. Douglas; the Plaintiff was represented by an experienced professional benefits representative; the ALJ questioned Plaintiff thoroughly and gave the representative the

opportunity to question Plaintiff further, which she did; and neither Plaintiff nor his representative mentioned the examination.

The undersigned therefore also finds that substantial evidence supports the ALJ's determination in this case.

## C. Motion for Remand for New Evidence

In the alternative, Plaintiff moves the Court to remand his claim to the Commissioner, pursuant to the sixth sentence of 42 U.S.C. section 405(g), arguing there is new evidence which is material and there was good cause for the failure to incorporate such evidence into the record at the administrative level. The Fourth Circuit has held:

> A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be "relevant to the determination of disability at the time the application was first filed and not merely cumulative." *Mitchell v. Schweiker,* 699 F.2d 185, 188 (4th Cir.1983). It must be material to the extent that the Secretary's decision "might reasonably have been different" had the new evidence been before her. *King v. Califano,* 599 F.2d 597, 599 (4th Cir.1979); *Sims v. Harris,* 631 F.2d 26, 28 (4th Cir.1980). There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, 42 U.S.C. § 405(g), and the claimant must present to the remanding court "at least a general showing of the nature" of the new evidence. *King,* 599 F.2d at 599.

Borders v. Heckler, 777 F.2d 954 (4th Cir. 1985).

Plaintiff has clearly met the fourth requirement – he presented more than a general showing of the nature of the new evidence– he submitted to the Court the actual documents upon which he bases his motion. With the exception of the September 17, 2008, record from Dr. Douglas, however, Plaintiff has not shown that there was good cause for his failure to submit the evidence while the claim was before the secretary. In this regard, Plaintiff argues:

> Mr. Sandy was represented by a non-attorney representative. It appears that the claimant's representative had recently had a serious illness. At the beginning of the hearing, she referred to her hospitalization and indicated that she had been unable to prepare a prehearing memorandum for that case.

(Plaintiff's brief at 14). The undersigned has already discussed the fact that Ms. Robinson is not an attorney, but is a professional, experienced benefits representative. The ALJ asked Ms. Robinson if she had an opening comment or argument, to which she did indeed respond that, "due to [her] hospitalization, [she] really didn't get a prehearing memorandum out to [you]." At one point in the hearing, she did "apologize for [her] coughing," at another point sneezed, and at another point she asked for tissues. It would be mere speculation, however, to find she had recently had a serious illness that prevented her from submitting the evidence at issue. Ms. Robinson submitted other evidence, including records from Dr. Douglas, at the hearing. On January 8, 2008, two weeks before the hearing, she submitted records from Dr. Malone, up to and including an office visit on November 15, 2007 (a date after all the newly-submitted records, with the exception of the 2008 office visit.). The undersigned therefore finds there was not good cause for the failure to submit the evidence which was in existence by the time of the administrative hearing in January 2008.

There is good cause for the failure to submit the September 17, 2008, record from Dr. Douglas, because that record was not in existence while the claim was before the Commissioner. The undersigned does not find, however, that the ALJ's decision "might reasonably have been different had the new evidence been before [him]." Plaintiff presented to Dr. Douglas, more than a year after his last documented visit to Dr. Douglas, and eight months after the ALJ's decision. He complained of continued low back pain into his left gluteal, left lateral thigh and occasionally into the anterior shin. His biggest relief was lying down on his left side. Dr. Douglas reviewed an MRI of the lumbar

spine from August 14, 2008, seven months post decision, which revealed a disc protrusion at L3-4, but no evidence of recurrent disc herniation. In fact, Dr. Douglas opined there was "[n]o significant change from 2007 in his MRI." The actual evidence therefore is generally the same as that which was before the ALJ. The only "new evidence" in this report is Dr. Douglas' opinion under Recommendations and Plan, which states:

> I do not feel he will ever return to any type of gainful employment. He has low back pain which required surgery and has had significant vascular insufficiency causing significant swelling of his left lower extremity. He has been required to be on Coumadin and even on the Coumadin he had a pulmonary embolus requiring a Greenfield filter placement. I do not recommend any surgical intervention at this given juncture. If his pain intensifies, we could contemplate a possible referral to pain management, but at this time I would wholeheartedly support his disability and I do not feel he will return to any type of gainful employment secondary to his back pain and significant vascular insufficiency.

First, the undersigned finds that Dr. Douglas' opinion is on an issue reserved to the Commissioner. Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled. 404.1527(e)(1).

Social Security Ruling (SSR) 96-5p states as its purpose:

> To clarify Social Security Administration (SSA) policy on how we consider medical source opinions on issues reserved to the Commissioner, including whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is; whether an individual's RFC prevents him or her from doing past relevant work; how the vocational factors of age, education, and work experience apply; and whether an individual is "disabled" under the Social Security Act (the Act). In particular, to emphasize:

1.     The difference between issues reserved to the Commissioner and medical opinions.

2.     That treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance.

3.     That opinions from any medical source about issues reserved to the Commissioner must never be ignored, and that the notice of the determination or decision must explain the consideration given to the treating source's opinion(s).

4.     The difference between the opinion called a "medical source statement" and the administrative finding called a "residual functional capacity assessment."

Moreover, SSR 96-5p also states:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, <u>they can never be entitled to controlling weight or given special significance</u>. (Emphasis added.)

The undersigned finds Dr. Douglas' opinion that Plaintiff would never be able to work is on an issue reserved to the Commissioner, and could not be given special significance even if the case were remanded for the ALJ to consider the new evidence.

Additionally, Dr. Douglas does not state that Plaintiff had been disabled at the time his claim was at the administrative level. The 2008 record also does not show Dr. Douglas actually examined Plaintiff that date or, if he did, the results of that examination. The document shows he listened to Plaintiff's complaints, reviewed a new MRI, and opined that the new MRI was generally the same

as the old one already in evidence. He then opined that Plaintiff would never return to any type of gainful employment. Notably, there are no other records submitted that would cover the time period from Plaintiff's November 2007 appointment with Dr. Malone to the September opinion of Dr. Douglas. There are also no other opinions that Plaintiff is disabled or was disabled during the relevant time.

Third, Dr. Douglas bases his 2008 opinion in large part on Plaintiff's vascular insufficiency; however, there is nothing in the record regarding that impairment since the hearing, during which Plaintiff testified that Dr. Adeniyi told him that he felt "safe enough" at the level of Coumadin Plaintiff was taking to "let [him] go for about a year." He did not have to go back to Dr. Adeniyi for a year.

Dr. Douglas refers to Plaintiff's having had to have a filter placement despite Coumadin therapy. This evidence was all before the ALJ, however, and reflects that Plaintiff did develop DVT after his back surgery in 2006. He was started on Coumadin. The DVT was considered mild. One month later, however, Plaintiff complained again of pain in his left calf. It was noted that Plaintiff had not taken his Coumadin for three days, saying he "ran out." In February 2007, he developed extension of his DVT. The specialist noted, however, that his anticoagulation therapy was sub-therapeutic, and admitted him "for IV Heparin and adequate coagulation since he did not fail medical management it was just a case of subtherapeutic INR and I do not think that he needs to have a filter."[4] Nevertheless, while he was in the hospital a filter was placed. By February 23, 2007, Plaintiff's left leg swelling was "still there but slightly better." He was also prescribed a support

---

[4]On this occasion, there is no mention of non-compliance, only that the amount of Coumadin Plaintiff had in his blood was non-therapeutic – it was not enough.

stocking "which he will need to help him control his leg symptoms." One month later, Plaintiff still had significant swelling, but "hasn't been compliant with his graduated support stockings." The doctor gave him a new prescription for the stocking.

Almost six months later, on August 8, 2007, the specialist stated that Plaintiff had "remained asymptomatic from his DVT in the lower extremities," even though he had had to go off anticoagulation therapy for an injection and possibly dental work. In the last record of visits for his DVT, Plaintiff's specialist noted that Plaintiff had had his Coumadin stopped in order to have a colonoscopy. The doctor found Plaintiff had an area of phlebitis in his left groin which was stable, and that his legs were "otherwise unremarkable," despite the temporary stop of Coumadin.

As already stated, during the hearing, Plaintiff was asked about the Coumadin. He testified that it was for his blood clot. The ALJ asked: "So, how is it now?" Plaintiff replied, "Well, I'm going to be on Coumadin the rest of my life . . . ." The ALJ asked, "So, what kind of problems does that cause you?" Plaintiff responded: "Well, it makes me highly susceptible to bleeding to death." He later testified that Dr. Adeniyi felt safe with the amount of Coumadin Plaintiff was taking, and did not need to see him for a year. There is no record indicating that Plaintiff did see Dr. Adeniyi during the next year. Dr. Douglas' opinion does not refer to recent exams or records. The last evidence of record from Dr. Adeniyi shows that Dr. Adeniyi first found Plaintiff's DVT "asymptomatic" then later, when he had been off Coumadin for a colonoscopy, "stable." The last evidence contained in the record before the ALJ was the November 15, 2007, record of Dr. Malone, which stated that Dr. Adeniyi did not want to see Plaintiff back for a year. Otherwise there was no discussion of DVT.

Although Plaintiff's DVT is undoubtedly a serious condition, there is no evidence that supports Dr. Douglas' opinion that it affected Plaintiff to the extent that, between it and his back pain, he would never return to any type of gainful employment. Regarding Plaintiff's back pain, Dr. Douglas' statement: "If his pain intensifies, we could contemplate a possible referral to pain management" undermines a finding that his back pain is disabling.

The record at the time, from Plaintiff's treating physician, indicates that Plaintiff had chronic lumbosacral back pain, but that he was clinically stable and used his Lortab very sparingly. There was no tenderness of the back November 15, 2007, the last examination on record.

For all the above reasons, the undersigned finds that the September 2008 opinion of Dr. Douglas, that Plaintiff would never be able to be gainfully employed, is not material to the extent that the ALJ's decision "might reasonably have been different" had the new evidence been before him. Borders v. Heckler, 777 F.2d 954 (4th Cir. 1985).

The undersigned therefore finds that Plaintiff has not met the criteria of Borders for remand based upon the new evidence submitted to the Court.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for SSI and DIB is supported by substantial evidence, and I accordingly respectfully recommend Defendant's Motion for Summary Judgment [Docket Entry 18] be **GRANTED**, and Plaintiff's Motion for Summary Judgment and Motion for Remand [Docket Entry 14] both be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984); cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _16_ day of June, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE